UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

NICOLE HELEN BRUNNER,

    Plaintiff,

    -v-

MADWELL, LLC,

    Defendant.

-------------------------------------------------------------X

**COMPLAINT**

**17 CIV.**

**JURY TRIAL DEMANDED**

## NATURE OF ACTION

1.    This action is brought by Plaintiff to recover damages for the defendant's violations of Plaintiff's civil rights, wherein she was subject to a hostile work environment, discrimination of the basis of sex and as a victim of domestic violence from a co-worker that defendants' principals' continually apologized for and reinforced. Though they finally fired the abuser after a year, grotesque emotional damage had been inflicted on Ms. Brunner, and to rub salt in the wound, they fired her as well.

## THE PARTIES

2.    Plaintiff is a resident of the City and State of New York, and her principal place of business is in Manhattan.

3.    Madwell, LLC is a limited liability company organized under the laws of the state of New York that has offices in New York State and Colorado. Its major clients are in Manhattan, including but not limited to Vita-Coco, a soft drink; SFARI (a non-profit), Sir Kensington, a specialty foods service which has offices on Lafayette Street in Manhattan; Specialty Food Stores, with various locations in Manhattan; and Happy Family Organics, foods, whose office is on Fulton Street. Upon information and belief, most of Madwell's

business comes from Manhattan, and, in any case, the business from Manhattan is significant.

## JURISDICTION AND VENUE

5.      Jurisdiction is proper in this district under 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States, among them Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1866, 42 U.S.C. § 1985(2); state and local claims are pendant under the same common nucleus of operative fact.

6.      Venue is proper in this district under 28 U.S.C. § 1391(c)(2) in that plaintiff has her principal place of business here, and insofar as defendant is "an entity with the capacity to sue and be sued in its common name under applicable law . . . . [is] deemed to reside . . . [in this] judicial district [insofar as it] is subject to the court's personal jurisdiction in" Manhattan. Id. In other words, plaintiff's place of business, plus defendant's significant contacts here confer jurisdiction under this venue provision, and plaintiff chooses this venue.

## FACTUAL ALLEGATIONS UNDERLYING PLAINTIFF'S CLAIMS

7.      Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 6 as if fully set forth herein.

8.      Plaintiff worked at defendant company for over a year and though she had no job description, she was a "cultural director" of sorts. Her performance was always satisfactory

9.      She met and started dating a man who worked at the firm, Nicholas Santaniello (variously referred to herein as Nick and "Mr. S.").

10.     Unfortunately, the relationship soured slowly but surely. Plaintiff broke off the

relationship and started seeing another man, who used to work at the agency, whom she is still seeing.

11.    On or about March 5, 2016, Santaniello, knowing this, threw a brick in plaintiff's window, destroying her bedroom. Ms. Brunner had broken up with Santaniello because of his abuse of alcohol, among other reasons, including previous physical abuse where he threw her into a fire hydrant (Ms. Brunner suffered no injuries).

12.    Although Ms. Brunner blocked him on Facebook, at one point his "profile picture" was of him drinking quaffing a cognac.

13.    He subsequently sent her a text indicating that he had broken her window but that it had been a mistake: he merely tapped a brick on the window and it broke. The photograph, however, makes it seem like the room had been subject to an earthquake.

14.    Ms. Brunner obtained a restraining order after complained to the police. Mr. S. pled guilty to disorderly conduct, accepted a two-year restraining order and had to pay for the window.

15.    Ms. Brunner had a meeting with Chris Sojka and David Eisenman, the owners of the Madwell immediately on March 6, and she told them everything.

16.    Chris asked, "When did you break up with Nick and why?" During that meeting the owners advised that Ms. Brunner could handle this however she wanted and that it would be *her* choice about how to move forward with Nick in her personal life.

17.    That to her seemed very condescending and obvious to plaintiff. Chris, whatever his intentions, said things about a moment of domestic violence in his own relationship with at least one, and perhaps more than one, former girlfriend; it made plaintiff feel as if he didn't want her to press charges because he characterized himself as the victim.

18.     Ms. Brunner had been told that Nick had previous problems with drinking. In fact, before Ms. Brunner worked there, he committed an act of violence against a chef at book signing at a restaurant, which the owners and other employees joked about: a man punching a chef because the chef supposedly took a signed menu book at a Madwell event. To Ms. Brunner felt it was inappropriate to joke about violence like that, and at the workplace.

19.     Chris - the person who said he had previously been involved in domestic violence - told her that he thought Nick deserved a second chance. He was then out of work for a month; Ms. Brunner believe he was getting paid and was told to "seek help."

20.     When Nick returned to work, things got worse. On one occasion, he sent a picture of plaintiff and her assistant of him and her that was titled "Divide," which is exactly how Ms. Brunner felt in the office when Mr. S. returned.

21.     He came into her cubicle and wherever Ms. Brunner was and stared at her until Ms. Brunner had to look away. This was constant.

22.     Employees in the office stopped talking to her, and Ms. Brunner did nothing to provoke this than complain about Nick's behavior.

23.     Ms. Brunner is likeable and was well liked and lost friends because of this, and people started dividing as to whose side one was on.

24.     There were many instances where Ms. Brunner would hear the company's teams whispering about what happened between them.

25.     Ms. Brunner complained about this atmosphere repeatedly to Chris and David, the owners. Chris again brought up his domestic violence problems and it got to the point in one meeting where Ms. Brunner told him to stop telling her about *his* experience, and that

this was not about *him.*

26.     In the first meeting about the problem he said he didn't want Nick's life to get messed up because of a mere brick through plaintiff's window – tongue firmly in check.

27.     Of course, Mr. S.'s life would have remained unchanged unless he violated the restraining order, which he did in letter and spirit over and over and over. Ms. Brunner felt threatened by Nick and Madwell did nothing about it.

23.     Ms. Brunner was told "If she felt uncomfortable, as long as Ms. Brunner gave them notice, she could look for another job." Elsewhere!

24.     The gall – how twisted that the owners would "allow" plaintiff to leave her job! In fact, Ms. Brunner loved her job and did it very well. The only problem was that there was an alcoholic, abusive employee who wouldn't abide by a restraining order, and the employer knew he had had problems for years. Now that things had completely come to a head, they were unwilling to fulfill their duties under the law.

25.     No one to plaintiff's knowledge knew what the rules were about how Nick and Ms. Brunner should interact - including Helen. The owners told her that, based on their lawyer Arnold Pedowitz's advice, that they should either fire both of them or should fire both of them.

26.     But what Ms. Brunner done? Ms. Brunner was told that Nick's alcoholism could be a basis for a lawsuit against Madwell, by someone else entirely.

27.     In fact even if someone is willing to accept substance abuse treatment, addiction cannot excuse violence or workplace harassment.

28.     Madwell made it seem as if it was being generous in keeping both employees; however, this was the same as saying that they could fire her for asserting her rights

under the law.

29.     Madwell did *initially* offer to pay for her therapy sessions, which Ms. Brunner was doing twice a week starting in March and ending in October 2016. Ms. Brunner wanted more, but they stopped paying when, as described below Nick was fired.

30.     Ms. Brunner could no longer afford therapy, though it was only $200 a month and this defendant's revenues are $8 million dollars annually.

31.     The owners told her that Nick would have to sign some "contract" and that he would not be able to drink on Madwell property or during Madwell events. He would also not be able to contact her regarding anything and would have to seek help.

32.     However, he did not adhere to this alleged "contract," and said that Pedowitz had messed up some wording on, so they couldn't fire Mr. S.

33.     On one occasion well into this debacle, Ms. Brunner left the office in tears when she saw Nick drinking. It was the first event (a birthday party that Ms. Brunner threw for employees) that Ms. Brunner had attended since everything broke down.

34.     Ms. Brunner expressed to the employers several times that she was uncomfortable about going to events without clear guidelines for Mr. S. They responded that Ms. Brunner was not required to go. But by so saying they limited her job as "Culture Manager" and lessened her involvement with the events that *she herself had organized*.

35.     Over the course of time, Ms. Brunner had several meetings with Chris wherein he made her feel like *she needed to talk to the abuser, Nick,* in order to make the company as a whole better.

36.     This was a violation of the restraining order and the law. Though he tried to make sure that Ms. Brunner knew Ms. Brunner didn't need to go to the events, the owners made

her feel that by cornering her like this, Ms. Brunner held the reigns to Nick's future at
Madwell in her hands.

37.     This was shameful on their part given Nick's problems and caused her great
distress. Chris even said that Nick and Ms. Brunner "figure it out" or he has to leave; this
would have been a violation of the restraining order, however.

38.     There is no way around it, Mr. S.  should have been fired upon the brick throwing
- he was known to be violent towards her and had done this before.

39.     Instead, they adopted the responsibility to police Nick, or pressure Ms. Brunner to
let her fear of a domestic abuser go.

40.     Each time that Ms. Brunner reported something, again and again, she was advised
that the owners had spoken to him and that it would never happen again. 41.      But it
did. Ms. Brunner had even expressed to them the staring, but that was not addressed (to
her knowledge) because it continued throughout. It was a thoroughly hostile work
environment reinforced by the principal's failure to cut Nick loose and reintegrate Helen
into the workplace.

42.     Ms. Brunner decided that she was too fragile to have a direct conversation with
Nick especially in front of the employer. She expressed that decision to Chris, but he
continued to insist Ms. Brunner work the problem out on her own. 43.      Because Ms.
Brunner was also the unofficial Human Resources person, there was no one but the
owners for her to go to speak to.

44.     Ms. Brunner felt after a while that they no longer wanted to deal with the problem
and that Ms. Brunner was a burden. Obviously, having to work with someone who
attacked your property – with the intention of attacking you –  is a pretty crazy

experience, especially when the office feels divided after that and Helen felt guilty as the victim.

45.     On 6/17/16, Ms. Brunner was working on a project to launch a new space on 266 Johnson St. Mr. S. was not supposed to be part of the project, but one of the other employees invited him. Ms. Brunner reached out to the owners to let them know and ask for their help, but the email went unanswered for several days. Ms. Brunner had to speak to the employee directly without saying all the reasons Ms. Brunner couldn't work with Nick. She asked them to manage him for this project.

46.     He also could not be invited to the team meetings if Ms. Brunner was there. It was so incredibly awkward to have to do that and Ms. Brunner felt like they were ostracizing her. But this should not have happened; no matter the value Nick added to the boy's club at Madwell, *Helen was the victim*.

47.     Helen's current boyfriend, Jay Merritt, who worked at the company, can attest that Ms. Brunner was emotionally scarred by the situation. Ms. Brunner was no longer staying at her apartment out of fear that Nick would come back. She changed her routes that she walked to work and separated herself from her office more than she would have liked.

48.     Ms. Brunner eventually moved to a new apartment to which only a few people knew the address. She had mentioned all her changes to the employers, so unless they were completely dense or trying to drive her out – and either one is certainly true - they understood the severity of her fear.

49.     Ms. Brunner was an emotional wreck and after a while no one was talking to her or listening to her side. After months of feeling unable to cope, on October 5, 2016, it

was Nick's birthday.

50.     Someone had sent him a cake that he left in the fridge for a few days. On Friday, October 7, Ms. Brunner decided to take a piece of it. Her assistant saw her do this to which Ms. Brunner joked to her "don't tell anyone," with a wink and a smile.

51.     Given all that had taken place prior to this, Ms. Brunner didn't think taking a piece of cake could amount to a thing, but it did.

52.     Nick was fired shortly thereafter because her cornered her in the backyard of Madwell and Ms. Brunner said was going to call the police. Owner David again apologized and said Nick would never do that again, but Ms. Brunner responded, "When does 'the contract' come into play? I have a restraining order."

53.     Finally Nick was terminated on October 11, 2016. This was when Madwell stopped paying the psychotherapy because they knew at that point they were going to fire Helen as well.

54.     Indeed, approximately a month later, Ms. Brunner was fired. The reason given was that Ms. Brunner had taken the piece of cake. This was a gross disparate treatment: Nick doesn't get fired for what he did and Ms. Brunner is fired for taking a piece of cake. Her assistant, who resigned for better job, allegedly told the owners that Ms. Brunner threatened her about her taking the cake.

55.     This is a lie; Ms. Brunner is a placid peaceful person and the "don't tell anyone" was a jovial matter. The company always had birthday parties and people ate cake. Ms. Brunner took one piece and someone else placed it on the counter for anyone to take a piece.

56.     Nick freaked out on the company intranet and this is why Ms. Brunner was fired;

whereas Nick's abuse toward her led to excuse after excuse after excuse. This is plain disparate treatment and retaliation for complaining in the first place, and for several weeks thereafter. (His aggressive message included saying that "whoever ate his cake was a deprived child and should have the courage to say it to his face.")

57.     Three other employees eventually replaced the cake since they were snacking on it. Ms. Brunner spoke to one of the employees later and she felt like she needed to replace it after his tantrum. Other people came forward to tell her not to and that he was unable to deal with his anger.

58.     Before her termination, Ms. Brunner felt Chris and David distancing themselves from her: Not returning her emails, looking at her or talking directly to her. Ms. Brunner expressed that to other employees and friends. They would never hold any 1 on 1 meetings with her to discuss her progress or how things were going. Ms. Brunner had to initiate all of those meetings. It was really disappointing, to put it mildly, not to feel supported in the office after the brick through her window.

59.     When Chris and David terminated her they told her that Ms. Brunner had manipulated them: that Ms. Brunner *lied* to them about the cake and that Ms. Brunner needed to be honest with herself and come clean. This was a falsehood. When Chris approached her previously about the cake, he said it didn't matter who did it but that Nick broke the law. Ms. Brunner told them during her termination meeting that she did cut the cake but that they were not there to protect her from Nick's - and their - abuse.

60.     Finally, when Ms. Brunner left, she asked to get her belongings and Ms. was told that Pedowitz would take care of it. Instead, when her attorney contacted Pedowitz, he threatened her with a "confidentiality agreement" suggesting that protected the company

against any complaint of this sort.

61.    Ms. Brunner found this chilling her rights under Title VII of the Civil Rights Act
and an act of Retaliation. She eventually got her belongings back, save a few nascent art
projects and evidence in her favor in this case – notes and cards from her co-workers
showing their appreciation – but it will be hard to mend her heart. She was a woman, in a
frat house environment, who was subjected to an act of violence by a man twice her size.
They knew Nick was a violent drinker, but for some reason sided with him throughout
this experience, despite that plaintiff was his victim and had a protective order in her
favor. Shame on them, and, more importantly, they must now pay to redress not just the
loss of work – and they fought her unemployment! – but the emotional scars that remain
stabbed into her soul.

COUNT ONE<br>(DISCRIMINATION ON THE BASIS OF GENDER UNDER TITLE VII)<br>DISPARATE TREATEMENT AND HOSTILE WORK ENVIRONMENT

62.    Plaintiff repeats, realleges, and incorporates by reference each and every
allegation previously made herein as if the same were more fully set forth at length
herein.

63.    Defendant's discriminatory behavior and then retaliatory termination of Plaintiff's
employment were made as a result of Plaintiff's sex.

64.    Defendant's animus towards Plaintiff's gender, female, is revealed in instances
where similarly situated male employees were treated differently than Plaintiff in respect
to her in the terms, conditions, and privileges of employment.

65.    The aforementioned acts of Defendant constitute unlawful discrimination against
Plaintiff in the terms, conditions and privileges of her employment because of her gender

and in in violation of the provisions of Title VII.

66.     As a further proximate result of Defendant's actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

COUNT TWO
(DISCRIMINATION ON THE BASIS OF GENDER UNDER NYCHRL)
HOSTILE WORK ENVIRONMENT AND DISPARATE TREATMENT

67.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

68.     Defendant's discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a result of Plaintiff's gender, female, and show an animus of gender bias and an ignorance of their obligation to provide a non-hostile work environment.

69.     The aforementioned acts of Defendant constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of the New York City Human Rights Law.

COUNT THREE
RETALIATION UNDER THE TITLE VII

70.     Plaintiff repeats and realleges all previous paragraphs as if set forth herein.

71.     Plaintiff was terminated and then threatened with violating a confidentiality agreement in order to chill her rights under the Civil Rights Laws, at least in part, because

she complained of unequal treatment in the workplace because of her sex and status as a

domestic violence victim and defendant retaliated against her because of it.

72.     As a result of the foregoing, plaintiff has been damaged.

## COUNT FOUR
## RETALIATION UNDER THE NEW YORK CITY HUMAN RIGHTS LAW

73.     Plaintiff repeats and realleges all previous paragraphs as if set forth

herein.

74.     Plaintiff was terminated and then threatened with violating a confidentiality

agreement in order to chill her rights under the Civil Rights Laws, at least in part, because

she complained of unequal treatment in the workplace because of her sex and status as a

domestic violence victim and defendant retaliated against her because of it.

75.     As a result of the foregoing, plaintiff has been damaged.

## COUNT FIVE
## VIOLATION OF 42 U.S.C. § 1985(2)

76.     Plaintiff repeats and realleges all previous paragraphs as if set forth herein.

77.     Plaintiff was subject to a hostile work environment and ultimately fired her

because she sought a protective order from an abuser at work and sought to enforce the

protective order.

78.     Madwell, acting through its two principals, made the conscious decision to

retaliate against plaintiff for the actions outlined in ¶ 77.

79.     As a result of the foregoing, plaintiff has been damaged.

## COUNT SIX
## (NEGLIGENT HIRING AND RETENTION)

80.     Plaintiff repeats and realleges all previous paragraphs as if set forth herein.

81.     Before plaintiff started at Madwell, Defendant knew it had an employee who was violent and could not control his substance abuse.

82.     Despite substantial evidence, defendant kept Mr. S. on for a year after he admitted to throwing a brock through plaintiff's window.

83.     As a result of the foregoing plaintiff's year was full of hostility that could have been prevented very easily: Nick's immediate termination.

84.     Instead, defendant apologized and protected Mr. S to Ms. Brunner's horror and expected her to suck up her pride and leave, despite that she was the victim.

85.     Such actions are harmful to society and harmed plaintiff.

86.     As a result of the foregoing, plaintiff has been damaged.

        WHEREFORE, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

        I. A judgment directing Defendant to reimburse and make Plaintiff whole for any and all earnings, including bonus payments, she would have received but for Defendant's discriminatory treatment and unlawful dismissal, including but not limited to, back pay, contractual damages and pension benefits;

        II. A judgment awarding Plaintiff compensatory damages for mental anguish, loss of dignity, humiliation, and injury to livelihood in an amount that is fair, just, and reasonable, to be determined at trial, including reasonable attorneys' fees, as provided under applicable law.

        III. A judgment awarding Plaintiff front pay;

        IV. A judgment awarding Plaintiff punitive damages;

        V. An award of prejudgment interest, costs and attorney's fees; and

VI. Such other and further relief that the Court may deem just and proper.

Dated: New York, New York
February 27, 2017

_Greg S. Antollino_

GREGORY ANTOLLINO, ESQ.
275 SEVENTH AVENUE, SUITE 705
NEW YORK, NEW YORK 10001
(212) 334-7397 gregory10011@icloud.com